**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHNNY P. RUIZ, JR.,

Plaintiff,

v.

N. WALKER; et al.,

Defendants.
_______________________________/

No. C 06-5559 SI (pr)

**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**

## INTRODUCTION

Johnny Ruiz alleged in his pro se civil rights complaint that several members of the correctional staff at Salinas Valley State Prison were deliberately indifferent to his safety by putting him in a cell with an enemy who he immediately attacked and by whom he was hurt in response to his attack. The court found that the complaint stated a claim against defendants Walker, Sotelo, Aldana, Rocha and Lonero under § 1983 for an Eighth Amendment violation. Defendant Sotelo (represented by a private attorney) filed a motion for summary judgment, as did defendants Walker, Aldana, Rocha and Lonero (represented by the California Attorney General's office). Ruiz filed an opposition. For the reasons discussed below, the motions will be granted and judgment entered in defendants' favor and against plaintiff.

## FACTS

The incident in question took place on September 29, 2005, in the administrative segregation ("ad-seg") unit at Salinas Valley State Prison, when Ruiz was put in a cell with inmate Marcus Guillen. The following facts are undisputed unless otherwise noted.

A. The Parties

Ruiz was a California prisoner serving a sentence following a conviction of attempted second degree murder. He was incarcerated at Salinas Valley from August 2002 through September 2006 and now is incarcerated at Corcoran State Prison. He was considered a Southern Hispanic because he was a Hispanic gang member in Southern California. Except for a single week in 2005, Ruiz has been housed in ad-seg since September 2004. As of July 2007, Ruiz was in ad-seg because he had been found guilty of battery on a correctional officer, attacking another inmate on June 15, 2005, and possession of weapons and drugs. He anticipated that he would finish his several disciplinary terms in 2009.

Defendants were employed at Salinas Valley on September 29, 2005. Sotelo was a correctional sergeant; Walker was a correctional lieutenant; and Aldana, Rocha and Lonero were correctional officers. Walker and Lonero worked in ad-seg unit D9. Sotelo, Aldana and Rocha worked in ad-seg unit D1.

B. June 15 Incident And Prelude To The Move

On June 15, 2005, Ruiz was celled temporarily with Guillen for a routine court trip. When they returned from court, Guillen made a statement to Ruiz to the effect of "I know what time it is with you," which offended Ruiz in some unexplained way, so he attacked Guillen with a piece of metal sharpened to a point. Ruiz Depo., RT 21, 114-115. Guillen suffered puncture wounds, abrasions and scratches in that attack. (Ruiz does not assert a claim based on the June 15 incident. It is mentioned only because it is relevant to the relationship between him and Guillen when the complained-of events occurred on September 29, 2005.)

After the June 15 attack on Guillen, Ruiz was placed in ad-seg unit D9. His cellmate was inmate Ballesteros. Ruiz and Ballesteros manufactured weapons that staff believed were to be used in a conspiracy to murder a correctional officer in mid-September.[1] Ruiz and Ballesteros

---

[1]On September 15, 2005, correctional staff received a tip of an impending attack in unit D9. Staff learned that the white inmates in the D9 ad-seg unit had numerous stabbing weapons and planned to withhold their food trays and block their cell windows after breakfast on September 16 to prompt the staff to enter to extract them, at which time they would batter the

"became a particularly disruptive presence" in unit D9. Walker Decl., ¶ 3. About a week before September 29, Ballesteros was moved out of the cell.

Lieutenant Walker ordered Ruiz transferred from unit D9. Walker stated that the transfer was due to the security risk Ruiz posed. When Walker authorized Ruiz's transfer away from unit D9, he did not have any input as to who would be Ruiz's new cellmate in his new ad-seg unit.

C. September 29 Events

On September 29, Ruiz was escorted by correctional officer ("C/O") Lonero from unit D9 to D1-D2. Ruiz had emerged voluntarily from his cell in D9 after being told that it was his turn to clean the showers. Only after he was out of his cell did he learn he was to be moved to a new unit. This kind of subterfuge was commonly used at Salinas Valley to lessen the tension associated with cell moves. At some point, C/O Lonero told Ruiz he would be moved to D1 or D2 and reunited with his former cellmate, Ballesteros. When they arrived at unit D1-D2, C/O Lonero ended her escort. She left Ruiz with correctional officers on duty and returned to unit D9. Consistent with prison policy, C/O Lonero did not participate in the final decision to house Ruiz with Guillen.

When Ruiz arrived in unit D1-D2, he was put in a holding cell in D2. Sergeant Sotelo told Ruiz that he would not be housed with his former cellmate (Ballesteros) due to institutional security concerns, he would instead be housed with a new cellmate, and he would be given an opportunity to talk with this prospective new cellmate. Shortly thereafter, Ruiz was moved to a holding cell in unit D1. Ruiz was moved from D2 to D1 because D2 contained few inmates who, like Ruiz, identified as Southern Hispanics. Sotelo stated that it was "important to house Southern Hispanics with other Southern Hispanics because celling them with members of other races or Northern Hispanics unnecessarily increases the potential for conflicts." Sotelo Decl., ¶ 3.

---

correctional officers with the weapons. Ruiz Decl., Exh. D. During a search, the staff found several weapons, including a 6-1/2 inch inmate manufactured weapon found in the cell occupied by Ruiz and Ballesteros. Ruiz Decl., Exhs. D and I.

Sergeant Sotelo then ordered C/O Aldana and C/O Ortega to find a cellmate who would be compatible with Ruiz. They went in search of another Southern Hispanic because Ruiz identified as a Southern Hispanic. In cell # 102, they found potential cellmate, Marcus Guillen, who also identified as a Southern Hispanic.[2] Because of their compatibility, Guillen was designated as a prospective new cellmate for Ruiz.

At this time, C/O Aldana did not know that Ruiz had attacked Guillen on June 15, 2005. C/O Aldana and sergeant Sotelo reviewed Ruiz's and Guillen's CDC-114 files that contained the ad-seg profile forms. Both declared that the forms they reviewed did not indicate that Ruiz previously assaulted Guillen or give any other indication that Ruiz and Guillen would be incompatible. Sergeant Sotelo conceded that an altercation such as the June 2005 one between Ruiz and Guillen usually would have resulted in an indication in both inmates' CDC-114 files to the effect that they were enemies, but specifically recalled seeing no such indication in the documents he reviewed. Ruiz presented evidence that there <u>was</u> documentation that Guillen was listed as a non-confidential enemy of Ruiz at the time of the move that was or should have been in his CDC-114 file. Ruiz Decl., Exh. B, Exh. F, pp. 2 and 4.[3]

The parties disagreed as to what happened while Ruiz was in the holding cell in D1. According to defendants, while Ruiz was in one holding cell, Guillen was placed in an adjacent holding cell to give them an opportunity to confer about compatibility before being housed together, consistent with prison practice. According to defendants, Ruiz and Guillen were in

---

[2]Sergeant Sotelo stated that the officers began looking for a compatible cellmate in cell # 101. Cell #101 did not have a Southern Hispanic inmate, so the officers went on to the cell next in order, i.e., cell # 102, in which Guillen and another inmate were housed.

[3]A CDC 114-A1 ad-seg profile listed Guillen as one of two enemies for Ruiz and stated that Guillen's name was added to the list on June 23, 2005. Ruiz Decl., Exh. F, p.2. A CDC-128 dated July 30, 2005, stated that due to Ruiz's battery with a weapon on Guillen in June, "it is to be noted on the CDC-812 in the C-Files of Inmate Ruiz and Guillen that an enemy situation exists and they are not to be housed on the same facility." Ruiz Decl., Exh. F, p. 4. The routing list for the CDC-128 did not indicate that it was put in the CDC-114 file, and Ruiz's evidence was only that the document should have been in his CDC-114 file, not necessarily that it was in there. A CDC-812 listed Guillen as an enemy for Ruiz, although there is no evidence that the document was supposed to be in Ruiz's CDC-114 file and the prison manual he submitted did not state that CDC-812s were to be put in the inmate's CDC-114 file. Ruiz Decl., Exh. B, E.

adjacent cells for about 20-30 minutes, talked to each other, and then verbally expressed their willingness to be celled together. By contrast, Ruiz stated that he "was never afforded the chance to speak with Guillen about cell compatibility and [he] never gave verbal consent to be housed with Guillen." Ruiz Decl., ¶ 13. Because they disputed what occurred at this point, the court accepts as true non-movant Ruiz's version in considering the pending motions.

Again consistent with prison practice, C/O Aldana and sergeant Sotelo had the prospective cellmates sign a chrono – prisonspeak for a memorandum – agreeing to double cell. Ruiz and Guillen signed the chrono below the text that stated, "Both inmates stated agreement to the cell assignment and signed below to indicate compatibility." Sotelo Decl.,¶ 13 and Exh. 1. Ruiz admitted in his deposition that he was familiar with the double cell chrono, had signed the form several times in the past, and signed this one. In his declaration, Ruiz stated that C/O Aldana gave him the document and told him to "hurry up and sign it," and that he signed the document in haste and without reading it. Ruiz Decl., ¶ 8; see also Ruiz Depo., RT 39-40.

After he signed the double cell chrono, Guillen was escorted back to cell # 102 and shortly thereafter Ruiz was escorted to that cell. Ruiz stated that he was escorted by Rocha,[4] Aldana and Sotelo, but defendants contended Aldana and Ortega were his escorts.

When Ruiz approached cell # 102 under escort, he said, "Hey, I know this guy and I can't go in there." Ruiz Depo, RT 43-44. Ruiz was unsure whether anyone heard him, so he repeated the statement. He admitted, however, that he did not turn around or direct this comment to anyone in particular and instead remained focused on the cell in front of him. None of the escorting officers indicated to him that they heard him; after he made the comment the first time, they called for the cell door to be opened, and, after he made the comment the second time, they pushed him into the cell. On September 29, unit D1 was loud and chaotic. Ruiz did not shout, scream, attempt to flee, or do anything else (other than make the quoted statement) to alert his escorts that being celled together with Guillen might lead to violence. C/O Aldana, who

---

[4]In his opposition brief, Ruiz stated that he "does not oppose summary judgment in favor of defendant Rocha." Plaintiff's Opposition, p. 1. Therefore, the court will not discuss Rocha's liability.

escorted Ruiz, stated that he did not hear Ruiz's statement. Sergeant Sotelo denied that he was part of the escort and denied hearing any comments Ruiz made while entering the cell. Sotelo stated that it was possible that he was in the general area, but if he was, he was not close enough to hear anything Ruiz said.

Once Ruiz was inside the cell, the officers removed Guillen's handcuffs and then removed Ruiz's handcuffs through the tray slot on the cell door. Once inside the cell and during the removal of handcuffs, Ruiz said nothing about his alleged concern about being celled with Guillen. The officers left the cell.

As the officers departed, Guillen appeared to Ruiz to be confused. Ruiz did not attempt to confer with Guillen to resolve any lingering concerns. Instead, as "part of the ego, the machoness, [and] the pride," Ruiz attacked Guillen. Id. at 57. Ruiz and Guillen fought for about a minute. In response to the altercation, the custody staff sounded an alarm and staff responded. C/O Ortega ordered the cellmates to stop fighting, which they did momentarily but then continued to wrestle. C/O Ortega then sprayed them with pepper spray.

During the altercation, Ruiz was injured. While he described the injuries as "severe physical injury to his throat and chest area" in his complaint, p. 4(II), Ruiz described the injuries as much more modest at his deposition: he sustained a puncture wound to his throat that did not require stitches and left a little hole about the size of the very tip of a pen on his throat, a bruise on his neck, and a scratch on his chest. Ruiz Depo., RT 66, 69, 71. He was escorted to the correctional treatment center for evaluation, and returned to custody in cell # 102 without a cellmate. The injuries interfered with his sleeping for about a month, such that he was only able to sleep about 6-8 hours per night. Within 5-6 days after the September 29 incident, Ruiz was transferred back to unit D9 and put in a new cell.

Defendants Lonero, Walker, and Aldana each declared that, on September 29, he or she did not know of the previous altercation between Ruiz and Guillen and did not know of any reason they would be incompatible as cellmates. They also stated that the final decision on housing was made by the supervisor on duty, sergeant Sotelo. Defendant Sotelo declared that he "was wholly unaware at that time that Mr. Ruiz had attacked Mr. Guillen back in June of

2005," and did not know that the two men "posed a threat of violence greater than that posed by celling any other two Southern Hispanic inmates together." Sotelo Decl., ¶ 16. Sotelo thought that Ruiz and Guillen were compatible because, among other things, he knew they were both Southern Hispanics, C/O Aldana advised him that they had said they were compatible, and both inmates signed the double cell chrono.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred at Salinas Valley State Prison in Monterey County, which is located within the Northern District. See 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, as is the situation with defendants' challenge to the Eighth Amendment claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions,



United States District Court
For the Northern District of California

answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

Where, as is the situation with the qualified immunity defense, the moving party bears the burden of proof at trial, and must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. See Houghton v. Smith, 965 F.2d 1532, 1536 (9th Cir. 1992). He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense. Id. at 1537; see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. When the defendant-movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). The verified complaint is considered in addition to the opposition materials filed by plaintiff.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631.

## DISCUSSION

A. Eighth Amendment Claim

The Eighth Amendment's prohibition of cruel and unusual punishment requires that prison officials take reasonable measures for the safety of inmates. See Farmer v. Brennan, 511 U.S. 825, 834 (1994). In particular, officials have a duty to protect inmates from violence at the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

hands of other inmates. See id. at 833. A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's safety. See id. at 834.

To be liable in a failure to prevent harm situation, the official must know of and disregard an excessive risk to inmate safety. See id. at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. See id. He need not "'believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before [he] is obligated to take steps to prevent such an assault.'" Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986) (citation omitted). Before being required to take action he must, however, have more than a "mere suspicion" that an attack will occur. Id.; see, e.g., id. at 460 (summary judgment appropriate as to defendants when plaintiff "failed to come forward with facts showing that these defendants had any reason to believe he would be attacked by the assailant").

When, as here, the prisoner seeks damages against a defendant, the "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988). Leer explained that "it is important to distinguish the causal connection required when a plaintiff seeks injunctive or declaratory relief as opposed to damages." Id. In the former case, a broader and more generalized approach to causation is taken. See id.

> When plaintiffs, such as the inmates, seek to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined. We must focus on whether the individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference. In order to resolve this causation issue, we must take a very individualized approach which accounts for the duties, discretion, and means of each defendant. . . . Sweeping conclusory allegations will not suffice to prevent summary judgment. . . . The prisoner must set forth specific facts as to each individual defendant's deliberate indifference.

Id. at 633-34 (citations omitted).

The dispute here focuses on the mental state of each defendant when each acted. Defendants more than met their initial burden on summary judgment. Lieutenant Walker presented evidence that he ordered Ruiz transferred out of D9 but did not have any input as to who Ruiz's new cellmate in D1 or D2 would be and did not take part in the placement of Ruiz in the cell with Guillen. C/O Lonero presented evidence that she escorted Ruiz to D1-D2 and left the area without participating in the final decision to house Ruiz with Guillen. Sergeant Sotelo presented evidence that he looked but did not see any documentation in the CDC-114 file indicating that Guillen was an enemy or otherwise incompatible with Ruiz and presented evidence that he was not an escort and did not hear any protests when Ruiz was put in the cell. C/O Aldana presented evidence that he looked in the CDC-114 file but did not see any document that indicated incompatibility of the two inmates and that he did not hear any protests when he put Ruiz in the cell with Guillen. C/O Rocha presented evidence that he did not know of any danger to Ruiz, and Ruiz concedes that Rocha is entitled to summary judgment.

Although defendants put Ruiz in a cell with an enemy, one cannot infer from the placement alone that defendants did it with deliberate indifference to a substantial risk to Ruiz's safety. Ruiz had to come up with more evidence of deliberate indifference, and tried to show two points on September 29 when defendants might have been alerted to a danger to him: when they looked at his CDC-114 file and when they brought him to the cell. Each will be considered.

Ruiz's evidence may show negligence in the with regard to the CDC-114 file, but negligence is not enough to establish an Eighth Amendment violation. Although there were one or two documents indicating that Guillen was Ruiz's enemy, the undisputed evidence was that defendants Sotelo and Aldana did not see those documents when they looked at Ruiz's CDC-114 file. It cannot be determined whether they were negligent in not seeing a document that was in the file or that someone else negligently failed to put the document in the file. Sergeant Sotelo conceded that there should have been an enemy notation in the CDC-114 file, but specifically stated that he did not see any such notation when he looked in that file before placing Ruiz in the cell with Guillen. Likewise, C/O Aldana stated that he did not see any enemy notation or other indication that Ruiz and Guillen could not cell together. Had Ruiz refused to sign the

double cell chrono and explained that Guillen was an enemy, the defendants might have looked more closely at the file or investigated further, but Ruiz did not do either of those things that could have avoided the placement. Defendants reasonably could rely on Ruiz and Guillen signing the chrono agreeing to be cellmates as confirmation that it was appropriate to house them together. Ruiz contended that he never gave verbal consent, but that does not show a triable issue of fact, because he admittedly did consent in writing to be housed with Guillen. He cannot fault defendants for his failure to read a document that he signed that led to his housing with Guillen.

With regard to Ruiz's statements made at the cell door, he did not prove, or show a triable issue of fact, that defendants acted with deliberate indifference when they put him in the cell. His utterance of the statement, "Hey, I know that guy and I can't go in there," does not raise a triable issue of fact under the circumstances. The statement was ambiguous at best and was made shortly after Ruiz had signed a double cell chrono agreeing to be cellmates with Guillen. Ruiz conceded he did not know whether anyone heard him, that he made the statement while facing cell # 102 and concentrating on its occupant, that the escorting officers did not make any move indicating that they had heard him, and that he made no further effort to avoid being put in the cell with Guillen after twice uttering the statement that the escorting officers did not appear to hear.

Ruiz presented evidence that purportedly showed that defendant Walker denied responsibility for ordering the move from D9 and that defendant Lonero said Ruiz was moved because she "needed to do compact." Ruiz Decl., Exh. G. This evidence is hearsay: the statements are part of the hearing officer's written recitation of statements from an investigative employee who relayed what various employees said and wrote to the investigative employee when he posed questions to them that he received from Ruiz. Even if one overlooked the hearsay problem and accepted the evidence as true, it cannot reasonably be inferred from this scant bit of evidence that defendants Lonero and Walker knew that Ruiz was destined to be housed with Guillen or knew Guillen was listed as Ruiz's enemy. That is, the evidence does not show anything relevant to knowledge of a risk of danger.



United States District Court
For the Northern District of California

Ruiz contended in his opposition that he "was targeted for assault by associates of the Mexican Mafia." Opposition, pp. 7-8. This argument fails to help his case for several reasons. First, his evidence suggested he was not targeted until long after the September 2005 incident. A form for his initial SHU review at Corcoran in September 2006 identified him as an active associate of the Mexican Mafia prison gang, and stated that a confidential memorandum dated May 15, 2006 identified him as having been targeted by other associates of the Mexican Mafia as part of the infighting within that gang at Salinas Valley. Ruiz Decl., Exh. C. A notice dated November 2, 2005 stated that an investigation into Ruiz's involvement with the Mexican Mafia prison gang was initiated on August 31, 2005, but that notice did not mention that any defendant participated in the investigation or was even aware of it, or that Ruiz had been targeted at that time. Ruiz Decl., Exh. F. Second, Ruiz presented no evidence that Guillen had any connection to the Mexican Mafia or acted at the behest of a faction of the Mexican Mafia that reportedly wanted Ruiz assaulted.[5] Third, Ruiz presented no evidence that any defendant knew anything about a Mexican Mafia problem for Ruiz before the September 29, 2005 incident occurred. Fourth, the apparent theory that he was targeted for assault by the Mexican Mafia collides with the fact that Ruiz (rather than Guillen) started the cell fight in which he was injured. Lastly, the complete absence of any mention in the civil rights complaint of a Mexican Mafia connection to the September 29 incident is quite telling in that it suggests Ruiz has only recently hypothesized a connection to the Mexican Mafia to resist the summary judgment motions.

Ruiz faulted correctional staff for telling him to that he was going to clean showers and only informing him of the impending move after he had left his cell. This sort of subterfuge is not unlawful. By not telling the inmate the bad news until he was outside of his cell, prison

[5]The documents Ruiz elsewhere argued should have alerted defendants to the danger of housing him with Guillen due to the June 2005 fight did not mention a Mexican Mafia gang affiliation for either him or Guillen. Ruiz's Exhibit F, p. 2, listed Guillen as an enemy of Ruiz but had no notation in the "gang status/comments" section of the form for Guillen. Ruiz's Exhibit B identified Ruiz was a member of the Elsinor Vatos Locos but did not mention any affiliation with the Mexican Mafia prison gang.

officials avoided the need for a cell extraction if he resisted the move. Despite Ruiz's argument otherwise, C/O Lonero's misstatement that led Ruiz to voluntarily exit his cell did not "deprive[] plaintiff of the chance to express his safety concerns and refuse a cell move and or a cellmate." Opposition, p. 11. Inside or outside of his cell, Ruiz could have expressed his safety concerns and could have refused a cellmate but instead chose to sign a compatibility chrono.

In sum, there was an absence of evidence from which a reasonable jury could conclude that Guillen was known to any defendant to be a danger to Ruiz when they moved him in with Guillen. When the evidence is viewed in the light most favorable to Ruiz, and inferences therefrom drawn in his favor, a reasonable jury could not find that defendants were deliberately indifferent to a known risk to Ruiz's safety. Defendants therefore are entitled to judgment as a matter of law on the Eighth Amendment claim.

B. Qualified Immunity Defense

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The rule of qualified immunity "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" Burns v. Reed, 500 U.S. 478, 495 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a particular sequence of questions to be considered in determining whether qualified immunity exists. The court must consider this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. See id. If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry

in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201-02 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

The first step under Saucier is to determine whether a constitutional violation was alleged. As a matter of pleading, plaintiff's complaint sufficed to allege an Eighth Amendment violation. However, as shown in the section above, the evidence in the record does not establish an Eighth Amendment violation. Even if the evidence did establish such a violation, that would only address the first step of the Saucier analysis.

The next step under Saucier is to consider whether the contours of the right were clearly established, an inquiry that "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201. The law was clearly established that a correctional officer could not disregard a substantial risk of serious harm to an inmate of which he was aware and had a duty to protect an inmate from violence at the hands of other inmates. See Farmer v. Brennan, 511 U.S. at 833. But there was no clearly established right for inmates to always be segregated and never allowed to come into contact with other inmates. On the day of the incident, "it would have been clear to a reasonable prison official that if he knew about an excessive risk to inmate safety, and inferred from the facts of which he was aware that a substantial risk of serious harm exists, he would violate the law by disregarding it." Estate of Ford v. Ramirez- Palmer, 301 F.3d 1043, 1050 (9th Cir. 2002).

The Ninth Circuit clarified the qualified immunity analysis for a deliberate indifference claim in Estate of Ford. The court explained that, for an Eighth Amendment violation based on a condition of confinement (such as a safety risk), the official must subjectively have a sufficiently culpable state of mind, i.e., "'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inferences.' . . . Thus, a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet

mistakenly, but reasonably, perceive that the exposure in any given situation was not that high. In these circumstances, he would be entitled to qualified immunity. Saucier, 533 U.S. at 205." Estate of Ford, 301 F.3d at 1050 (quoting Farmer v. Brennan, 511 U.S. at 834). In Estate of Ford, the court explained that even though the general rule of deliberate indifference had been expressed in Farmer, no authorities had "fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.'" Estate of Ford, 301 F.3d at 1051 (quoting Farmer, 511 U.S. at 834 n.3. Because it had not been fleshed out, "it would not be clear to a reasonable prison official when the risk of harm from double-celling psychiatric inmates with one another changes from being a risk of some harm to a substantial risk of serious harm. Farmer left that an open issue. This necessarily informs 'the dispositive question' of whether it would be clear to reasonable correctional officers that their conduct was unlawful in the circumstances that [they] confronted." Estate of Ford, 301 F.3d at 1051 (emphasis in original).

Applying Estate of Ford here proves fatal to Ruiz's case because, even if defendants heard him protest at the cell door, he had just signed a written compatibility chrono to be housed with Guillen. It would not have been clear to a reasonable prison official when the risk of harm from double-celling inmates where both had just agreed in writing to be cellmates but one protested (without actually mentioning a specific danger) when officials brought him to the cell changed from being a risk of some (or even any) harm, to a substantial risk of serious harm to the inmates. A reasonable prison official understanding that he could not recklessly disregard a serious risk to inmate safety could reasonably perceive that the inmate's exposure to any risk of harm was not that high when there was no evidence of a specific threat from inmate Guillen and both had just agreed in writing to be cellmates. Because the law did not put defendants on notice that their conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. See Saucier, 533 U.S. at 202. Defendants met their burden of proof in their moving papers and Ruiz did not introduce evidence to show the existence of a genuine issue of fact on the defense. Defendants are entitled to judgment as a matter of law on the qualified immunity defense.

## CONCLUSION

For the foregoing reasons, defendants are entitled to judgment as a matter of law on the merits of plaintiff's Eighth Amendment claim as well as on defendants' qualified immunity defense. Defendants' motions for summary judgment are GRANTED and judgment will be entered in their favor. (Docket # 21, # 32.) The clerk shall close the file.

IT IS SO ORDERED.

Dated: February 25, 2008

SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California